# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| RICHARD CLARK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-492-SLR |
| | ) |
| MICHAEL ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

John S. Grady, Esquire of Grady & Hampton, LLC, Dover, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, Esquire, United States Attorney, District of Delaware, and Dina White Griffin, Esquire, Special Assistant United States Attorney, District of Delaware, Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, and Kimberly Varillo, Assistant Regional Counsel of the Office of General Counsel, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

Dated: February 15, 2012
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Richard Clark ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for summary judgment asking the court to award DIB. (D.I. 13) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 15) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for DIB on August 19, 2005 alleging disability beginning August 5, 2003 due to a car accident in 2003 and problems with his back, hip and knees. (D.I. 12 at 73) Plaintiff was 44 years old on the onset date of his alleged disabilities. (*Id.* at 9, 28) Plaintiff's initial application was denied on February 23, 2006 and upon his request for reconsideration on April 16, 2007. (*Id.* at 14) Plaintiff requested a hearing, which took place before an administrative law judge ("ALJ") on August 12, 2008. (*Id.*)

---

[1] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

After hearing testimony from plaintiff and a vocational expert ("VE"), the ALJ decided on September 19, 2008 that plaintiff is not disabled within the meaning of the Social Security Act, specifically, that plaintiff can perform other work that exists in the national economy. (*Id.* at 29) Plaintiff's subsequent request for review by the Appeals Council was denied. (*Id.* at 11) On June 8, 2010, plaintiff brought the current action for review of the final decision denying plaintiff DIB. (D.I. 1)

## B. Plaintiff's Non-Medical History

Plaintiff was born August 10, 1958 and is currently 53 years old. He has a high school education and past work experience as an auto body mechanic and a tile installer. (D.I. 12 at 28) He lives with his fiancee and son, who was 19 years old at the time of the hearing. (*Id.* at 43)

Plaintiff has suffered several injuries, which will be discussed in further detail in the context of his medical history, *infra*. He was involved in an auto accident (as an unrestrained passenger) in a head-on collision on August 5, 2003, where he sustained a fractured left acetabulum, as well as bruising and scraping. (*Id.* at 17) This accident marks plaintiff's onset of alleged disability. Thereafter, on February 27, 2004, plaintiff sustained a crushed wrist injury to his left wrist. (*Id.*) Plaintiff's last insured date for purposes of DIB eligibility was December 31, 2005. (*Id.* at 25) On February 26, 2006, plaintiff was a restrained passenger in a motor vehicle rollover accident, wherein he sustained multiple spinal fractures. (*Id.* at 19) Plaintiff has not worked since the 2003 accident due to pain. (*Id.* at 35)

## C. Medical Evidence

2

On July 18, 2003, Dr. Jay Fried, M.D. of the Center for Neurology MRI P.A. conducted a physical examination of plaintiff. At that time, Dr. Fried noted that plaintiff has had back problems since 1996, as well as leg pain, and that he had not worked for over a year. (D.I. 12 at 227) Plaintiff was taking Percocet, Soma, Flexeril and Motrin which helped "somewhat." (*Id.*) Dr. Fried assessed lumbar radiculopathy, refilled plaintiff's prescriptions for Soma and Percocet, and "[d]iscussed the use of narcotics and his functioning at home." (*Id.*)

Plaintiff was admitted to Beebe Medical Center on August 5, 2003, following a significant motor vehicle accident wherein plaintiff was an unrestrained passenger in a pickup truck that was hit head-on by a tractor trailer.[2] (*Id.* at 17, 217, 225) No injuries to plaintiff's neck or chest were detected, however, plaintiff sustained a significant injury to his left hip (fracture of the acetabulum) which required surgery. (*Id.* at 221-23, 225) The surgeon noted that plaintiff's sciatic nerve was "injured under direct visualization with eccymosis[3] but there was no evidence of sciatic nerve dysfunction either preoperatively or postoperatively, except for a previous sciatica that he had from a bad disc." (*Id.* at 226) Plaintiff was discharged on August 8, 2003, with Dr. David Sopa, D.O. noting that he had achieved excellent x-rays, and that plaintiff was able to stand and walk shortly after surgery (with ambulatory assistance). (*Id.* at 215)

On September 2, 2003, plaintiff presented to Beebe Medical Center with low back and hip pain (at a claimed "10/10" level). (*Id.* at 202) The emergency room record

---

[2]The accident was a fatal one; plaintiff's boss, the truck's driver, was killed next to him. (D.I. 12 at 35, 215)

[3]Tissue injury, such as bruising.

3

indicates that plaintiff stated that he had recently ran out of pain medication. (*Id.* at 200) Plaintiff was deemed to be in only "mild" distress on physical examination by the physician and had a painless range of motion for his back. (*Id.* at 202) Plaintiff was discharged to Dr. Fried. (*Id.* at 201)

The next day, Dr. Fried noted that plaintiff continued to have severe hip pain and that he was taking more Percocet and also methadone, that plaintiff was out of medication, and that the emergency room did not help him much. (*Id.* at 228) Dr. Fried "[d]iscussed the need to contact [him] about increased use of the narcotics," increased plaintiff's methadone prescription, and ordered a hip x-ray to make sure it was still in place. (*Id.*)

Dr. Fried examined plaintiff on September 10, 2003, where he noted that plaintiff had continued hip pain and more numbness in his buttock since the accident. (*Id.* at 229) Dr. Fried noted some pain upon physical examination, tenderness, and decreased sensation over his left anterior leg and dorsal foot, whereupon he assessed "[p]ossible nerve injury [which] could be sciatic neuropathy." (*Id.*) Dr. Fried noted that plaintiff saw Dr. Damouri who put him on Lexapro and trazodone at night, and that plaintiff "forgets a lot of things he has read about." (*Id.*) Dr. Fried refilled plaintiff's pain medications, stopped Soma, continued Lexapro and Flexaril, and discussed getting an EMG with plaintiff. He also noted that plaintiff "[a]greed with seeing a psychologist," which "might be useful [for] dealing with multiple issues." (*Id.*)

On September 26, 2009, Dr. Fried examined plaintiff who reported left hip pain, as well as left leg and foot pain. (*Id.* at 231) Plaintiff reported that his pain "has been a

4

lot worse recently with a history of lumbar surgery." (*Id.*) Plaintiff "fe[lt] that the pain from the hip fracture is improving," and had stopped the Lexapro due to hives. (*Id.*) Dr. Fried noted that plaintiff was feeling "anxious" and was "worried about getting a paycheck again," as he was having financial troubles. (*Id.*) Dr. Fried assessed "[s]ciatic neuropathy versus lumbar radiculopathy," refilled plaintiff's pain medications, recommended a MRI and an EMG, and discussed a change in plaintiff's antidepressant. (*Id.*) He also discussed with plaintiff the fact that he had not been compensated for the car accident and suggested that plaintiff "could talk to his lawyer about trying to get a check earlier" as Dr. Fried "[s]uspect[ed] that this [was] increasing the stress." (*Id.*)

On October 15, 2003, Dr. Fried noted that an EMG of plaintiff's lower left extremity "showed spontaneous activities in the sciatic nerve distribution, especially in the peroneal nerve distribution[.]" (*Id.* at 237) Nerve conduction studies of the lower extremeties were normal. (*Id.*) Plaintiff reported numbness in the left leg, as well as burning, which he stated had been occurring ever since the accident. (*Id.*) Plaintiff lost 20 pounds since the accident and was having trouble sleeping. (*Id.*) Dr. Fried noted a "5/5 strength" in plaintiff's lower left extremity upon examination, and refilled plaintiff's pain medication, as well as trazodone for sleep. He stated that plaintiff "has a good prognosis for recovery of motor strength" and that plaintiff "is in fairly good strength at this point and [has] preserved nerve conduction velocities." (*Id.*) Dr. Fried also noted that plaintiff was expecting forthcoming disability compensation. (*Id.*)

On November 12, 2003, Dr. Fried treated plaintiff for left leg pain, at which time

5

he noted plaintiff's frustration with not being back to his original functional level. (*Id.* at 239) Dr. Fried refilled plaintiff's pain medications and discussed with plaintiff going to physical therapy for conditioning. (*Id.*)

On December 5, 2003, Dr. Fried noted that plaintiff was still having lower back pain, which was "the same pain since 1998," but that "[s]ince his last accident, it has been a lot worse." (*Id.* at 240) He noted that plaintiff has been taking extra doses of methadone, was not sleeping well and is almost out of medications. (*Id.*) Dr. Fried increased plaintiff's methadone, prescribed Remeron for sleep, but decreased Percocet and noted that he wanted to try to get plaintiff off Percocet in the future. (*Id.*) Dr. Fried also discussed with plaintiff that it would be difficult for him to get back to competitive work again given his problems, including "chronic back pain." (*Id.*) Shortly thereafter, on December 17, 2003, Dr. Fried noted that plaintiff's medications were "working well." (*Id.*)

On January 14, 2004, Dr. Fried treated plaintiff for back and hip pain, noting that Dr. Sopa had ordered a MRI of plaintiff's hip. (*Id.* at 243) He noted that Remeron was helping with plaintiff's mood. (*Id.*) Dr. Fried noted that plaintiff "has started to get around a little bit again, but [is] still quite limited," and commensurately noted that plaintiff "is starting to get better again." (*Id.*) He also noted that plaintiff's mother was very ill. (*Id.*) Dr. Fried noted very diminished movement of the left hip with pain, and refilled plaintiff's medications pending results of the MRI. (*Id.*)

A MRI taken February 6, 2004 revealed "[d]egenerative disc disease, with mild broad protrusion at L3/4 and L4/5 with marked central disc herniation, seen as

6

extrusion at L5/S1. Associated central lumbar stenosis is present at L5/S1." (*Id.* at 262) Also on that date, plaintiff was examined by Dr. Fried for back and hip pain. He reported that plaintiff stopped taking methadone because it was giving him cognitive problems, which did get "a little bit better" when he stopped. (*Id.* at 244) Dr. Fried increased plaintiff's Percocet, noting that plaintiff "has not had much depression" and still had some decreased movement in his right hip. (*Id.*) He also prescribed Duragesic patches for pain. (*Id.*) Dr. Fried again noted some pain and tenderness on February 20, 2004, and that plaintiff was "getting around a little bit better." (*Id.* at 245) Plaintiff had a "5/5" for strength in his lower right extremity, but had decreased sensation. (*Id.*) Dr. Fried noted that "[h]erniated nucleus pulposus [were] seen at multiple levels on [plaintiff's] back," probably caused by "the L5-S1." (*Id.*) Dr. Fried discussed surgical options with Dr. Sopa and refilled plaintiff's pain medications. (*Id.*)

On February 27, 2004, plaintiff presented to Beebe Medical Center with a crushed wrist injury. The nurse's intake notes that plaintiff had a washing machine fall on his left hand the day prior, while the physician's notes indicate that plaintiff's wrist was crushed between the washer and a wall. (*Id.* at 192, 194) He reported a "7/10" pain level and was noted to be in "no acute distress." (*Id.*) After a negative x-ray, plaintiff was placed in a splint and discharged to Dr. Sopa. (*Id.* at 192-93)

On March 5, 2004, Dr. Fried treated plaintiff for back pain. Dr. Fried noted that plaintiff "was lifting a heavy object with a friend the other day and [it] slipped and hit his left arm," after which he treated with Dr. Sopa. (*Id.* at 246) Plaintiff utilized Duragesic patches for pain. (*Id.*) Dr. Fried noted a positive straight leg raise on the left side,

7

however, decreased sensation. He discussed with plaintiff "finding ways to modify his activities at home. I would like him to stay active but needs to avoid heavier activities, which could worsen his problems even further." (*Id.*) Plaintiff treated again with Dr. Fried on March 17, 2004, at which time Dr. Fried refilled plaintiff's Percocet and, as plaintiff had stopped using Duragesic patches, switched plaintiff to OxyContin. (*Id.*)

On April 7, 2004, Dr. Fried noted that, despite plaintiff's having some pain in his back and hip and some tenderness in his back, the medicines were working "a little bit better" and plaintiff "is trying to get around better." (*Id.* at 248) On May 5, 2004, Dr. Fried noted that plaintiff was still experiencing back pain and had run out of OxyContin because he was taking extra doses. (*Id.* at 249) Plaintiff was scheduled for surgery with Dr. Sopa and discussed that as well as stresses at home (in caring for his mother) with Dr. Fried, who noted that an antidepressant might be beneficial depending on plaintiff's progression. (*Id.*)

On May 3, 2004, plaintiff was examined by Dr. Fadi Damouni, M.D. to obtain "[p]reoperative clearance for lumbar disc disease surgery." (*Id.* at 207) Plaintiff reported "no chest pain, no shortness of breath, no headache, no palpitations" and "good exercise tolerance," in that he "walks 2 to 3 miles without any problems."[4] (*Id.*) Dr. Damouni also reported that plaintiff "can also climb stairs on an average of 20 to 30 stairs at a time without any problems." (*Id.*) Plaintiff was using a cane to ambulate due to pain in his right leg. (*Id.* at 208) Plaintiff's physical examination was not notable outside of an elevated blood pressure. (*Id.* at 208-09) Dr. Damouni included

[4]Plaintiff is a lifetime smoker. Dr. Damoudi noted later that plaintiff reported history of shortness of breath and cough only "on very rare occasion." (D.I. 12 at 208)

8

"depression" in his overall assessment, and stated that he "would recommend aggressive IV hydration prior to his surgery and good pain control." (*Id.* at 209)

Plaintiff treated with Dr. Fried on June 2, 2004 for his ongoing physical issues, and also discussed with Dr. Fried his stress in caring for his mother at home. (*Id.* at 250) Plaintiff continued on his pain medications, as well as Valium for sleep. (*Id.*) On July 2, 2004, Dr. Fried again noted plaintiff's back pain (as well as some tenderness), and that plaintiff was awaiting surgery. He continued plaintiff's medications. (*Id.* at 251) A similar visit took place on July 28, 2004, whereafter Dr. Fried also noted that he "[d]iscussed [with plaintiff] normal activities at home as tolerated." (*Id.* at 252)

On August 6, 2004, plaintiff treated with Dr. Fried who reported that plaintiff was experiencing worsening back pain and "was climbing up the ladder to help his friend[.]"[5] (*Id.* at 253) Dr. Fried noted that plaintiff's radiculopathy was "probably aggravated by increased activities." (*Id.*) Dr. Fried discussed increasing plaintiff's OxyContin, but did not prescribe additional medications in view of the upcoming surgery with Dr. Sopa. (*Id.*) The day before surgery, August 18, 2004, Dr. Fried again examined plaintiff, refilled his medications, and noted that "[t]his motor vehicle accident has increased his problems significantly relating to the hip fracture and increasing back problems." (*Id.* at 254)

On August 19, 2004, plaintiff underwent back surgery with Dr. Sopa for "degenerative disc disease at L5/S1 with foraminal stenosis at L4 and L5." (*Id.* at 212)

---

[5]Dr. Fried subsequently noted that plaintiff "has not been able to handle those as well," and it is not clear from the context whether he is referring to handling increasing back pain, or handling ladders. (D.I. 12 at 253)

9

Specifically, Dr. Sopa performed a "laminectomy[6] at L4/5 and L5/S1 with bilateral foraminotomy[7] at L4/5 and L5/S1 application of a posterior oblique spinal cage at L5/S1; and pedicle screw application at L5/S1." (*Id.*) On September 9, 2004, Dr. Fried stated that plaintiff's surgery was healing "pretty well" despite continued pain in his back, and that plaintiff "is starting to get around a little bit more." (*Id.* at 255) On September 23, 2004, Dr. Fried noted as follows:

Mr. Clark is still having some pain in his leg. It has gotten a lot better since the surgery. He is ready to cut down the OxyContin again. He is helping out his mother and starting to play a little bit of pool. He gets out with his friends on occasion.

(*Id.* at 256) At that time, Dr. Fried decreased plaintiff's OxyContin and refilled his other medications, and "[d]iscussed gradually getting back to activities for fun and enjoyment again." (*Id.*)

On October 15, 2004, Dr. Fried noted that plaintiff's surgery seemed to be helping, and that plaintiff will need sedentary work if he is going to enter the workplace upon his legal settlement. (*Id.* at 257) Dr. Fried noted on November 12, 2004 that plaintiff's back pain was "slowly getting better" and that plaintiff was trying to assist his ailing mother. (*Id.* at 258) On December 10, 2004, Dr. Fried noted that plaintiff's mother passed away two weeks prior, that plaintiff had to do some traveling, and that his back pain has been a little worse recently. (*Id.* at 259) Dr. Fried discussed with plaintiff "stress and how it can affect pain" and recommended counseling. He also

---

[6]Generally, the removal of a disc fragment, bone spur or other source of nerve compression.

[7]Generally, decompression surgery performed to enlarge the passageway where a spinal nerve exits the spinal canal.

10

noted that plaintiff planned to seek vocational counseling, and is "pretty limited in what he can do," as he cannot sit or stand "for too long" or do "much lifting." (*Id.*) On December 17, 2004, Dr. Fried noted that plaintiff's medications have not been working very well, and that plaintiff was going to Philadelphia for vocational counseling. They discussed "not overdoing it so much and get hiring [sic] some help," as well as getting a urine drug test. (*Id.* at 261)

Dr. Fried described plaintiff's stress from personal issues on January 7, 2005, refilled his pain medications, and ordered a drug screen.[8] (*Id.* at 263) On January 28, 2005, plaintiff reported knee pain, but that "[t]he pain medications seem to be working well" and that "he can cut down on the medicines somewhat since he has been doing better." (*Id.* at 264) Following plaintiff's urine test results (indicating the presence of benzodiazepine and narcotics), Dr. Fried discussed "being on probation and following all of the rules to get out of trouble,"[9] and refilled plaintiff's medications. (*Id.*) On February 16, 2005, Dr. Fried noted that plaintiff has some pain in his left arm, and has "had a few bad days," but that "[h]e was instructed to get on with his life again." (*Id.* at 265) Plaintiff treated with Dr. Fried again on March 16, 2005 for leg pain, and received pain medications. (*Id.* at 266) A similar visit occurred on April 13, 2005, during which Dr. Fried also noted that plaintiff was still trying to settle his legal issues, and was uncertain what he wants to do in the future. (*Id.* at 267)

---

[8]Dr. Fried noted that "the patient will need to go to [get it] done at this point in order to continue to follow [sic] in our office." (D.I. 12 at 263)

[9]It is not clear why plaintiff was counseled in this regard insofar as Valium (a benzodiezapine) and OxyContin and Percocet (narcotics) were prescribed by Dr. Fried; the quantities revealed in testing were not discussed in Dr. Fried's note. (D.I. 12 at 264)

On May 11, 2005, Dr. Fried noted that plaintiff was experiencing "a lot of pain in his legs" that had been getting "a little bit worse," and that plaintiff "has been trying to stay busy at home." (*Id.*) On June 8, 2005, Dr. Fried again treated plaintiff for leg pain, and stated that plaintiff asked to increase his OxyContin. (*Id.* at 269) Dr. Fried noted that plaintiff was still trying to stay busy at home, and "is still doing some exercising." (*Id.*) They discussed getting additional education and learning about computers, and Dr. Fried increased plaintiff's OxyContin and decreased his Percocet prescription. (*Id.*) On July 6, 2005, Dr. Fried noted that plaintiff's "[m]edicines are working a lot better." (*Id.* at 270)

On August 3, 2005, Dr. Fried noted again that, while plaintiff still has some back pain, the medicines seem to be working. (*Id.* at 271) Dr. Fried discussed antidepressants with plaintiff on August 31, 2005, as well as "finding activities of enjoyment again and dealing with family issues." (*Id.* at 272) On September 28, 2005, Dr. Fried noted that plaintiff wanted to increase his dosage of medicines, and "is not doing a whole lot at home." (*Id.* at 273) They discussed "exercise at home" including doing "more regular walking," and plaintiff's legal issues ("to try to settle and make him happy again."). (*Id.*)

On October 5, 2005, Dr. Sopa noted that plaintiff had continued left leg pain and mild numbness, but "no evidence of neuropathy despite his drinking or drug habits." (*Id.* at 280) Dr. Sopa stated that plaintiff has "true sciatica," but that "[t]he sciatica has been ameliorated significantly by his surgery, but he still has some mild problems." (*Id.*) In sum, plaintiff "had improvement from surgery and worsening after the motor vehicle

12

accident." (Id.)

On October 26, 2005, Dr. Fried examined plaintiff and noted that plaintiff's medicines seem to be helping, that plaintiff was still seeking to settle his legal issues, and that they discussed "long-term looking at lighter duty work, administrator type work." (Id. at 274) On November 16, 2005, Dr. Fried noted that plaintiff was experiencing stress in dealing with his son, who was having a lot of health and behavioral problems; they discussed "getting more professional help." (Id. at 275) Plaintiff remained on his medications during this period. (Id.)

On December 13, 2005, plaintiff completed a "Function Report – Adult" wherein he reported his daily activities. Therein, plaintiff stated that he feeds and walks his dog around the yard if the pain allows him to. (Id. at 142) He reported that he wakes up every 2-4 hours at night, and that dressing, bathing and grooming takes "longer to do because of pain." (Id.) Plaintiff prepares his own meals, though this also takes longer. (Id. at 143) He reported being able to do house and yard work, again, "but it takes longer to do due to back [and] hip pain." (Id.) He drives when his pain permits and can shop for about an hour, every other week. (Id. at 144) Plaintiff reported being able to pay bills and handle his finances. (Id.) Under "hobbies and interests," plaintiff listed "watching tv," "shooting pool" and "dancing." (Id. at 145) While he can watch television every day (with breaks in sitting due to pain), the latter activities, however, "depend on [his] pain." (Id.)

Plaintiff also reported at this time that the time he could spend with friends was dependant on his pain levels, and that he sometimes forgets appointments "due to pain

13

and med[ication]s." (*Id.*) He occasionally gets moody and does not socialize overall as much as he did before his conditions. (*Id.* at 146) With respect to his abilities, plaintiff reported that he is right-handed, cannot walk "to[o] far," needs 10-15 minute breaks when walking, and can pay attention for 15-20 minutes. (*Id.*) He reported "good and bad days" with stress and a fear of large trucks. (*Id.*) Plaintiff also noted that he uses a cane "[w]hen [he is] going to be on [his] legs for any length of time or going to walk more than [he] needs to."[10] (*Id.* at 147)

Plaintiff also completed a "pain questionnaire" on December 13, 2005 wherein he reported that he had lower back and hip pain all of the time, as well as left leg pain. (*Id.* at 149) He reported that his medications were not controlling his pain. (*Id.*) Plaintiff noted that there were "no side effects" from the medications. (*Id.*)

On December 21, 2005, Dr. Sopa stated that plaintiff was "doing well at this time; he says that the back is not giving him much trouble and he is pleased with the way it came out." (*Id.* at 279) Additionally, "[t]he acetabulum does not seem to give him much trouble[.]" (*Id.*) On February 13, 2006, Dr. Fried noted that plaintiff had recently enjoyed a vacation to the Carribean, that he was "getting around pretty good," and that he had cut down on his medications. (*Id.* at 371)

On February 20, 2006, after plaintiff's date last insured (December 31, 2005), state agency physician Dr. M. H. Borek examined plaintiff and concluded as follows: plaintiff can occasionally lift and/or carry 10 pounds; frequently lift and/or carry 5 pounds; stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8-

---

[10]Plaintiff noted that the cane was prescribed in "9/03," but there is no medical evidence of record corroborating this account. (D.I. 12 at 147)

14

hour workday; and sit (with normal breaks) for a total of at least 2 hours in an 8-hour workday. (*Id.* at 282) Plaintiff can not utilize a rope, ladder or scaffolds, but can occasionally climb a ramp or stairs, balance, stoop, kneel, crouch or crawl. (*Id.* at 283) A "limited" manipulative limitation was checked off for "handling (gross manipulation)" and "fingering (fine manipulation)," without further explanation. (*Id.* at 284) Dr. Borek found that plaintiff should avoid concentrated exposure to extreme cold and vibration, and avoid moderate exposure to hazards (machinery, heights, etc.). (*Id.* at 285) He also noted that plaintiff bent forward and to the side when he walked and seemed to be very uncomfortable when seated for the interview.[11] (*Id.* at 288) Dr. Borek concluded that plaintiff is partially credible for his inability to do any work activity, and his maximum residual functional capacity ("RFC") is for sedentary work.[12] (*Id.*)

Shortly after Dr. Borek's examination, plaintiff treated with Dr. Fried who discussed with plaintiff the dangers of narcotics and plaintiff's continuing with "ANA meetings." (*Id.* at 377) Two days later, on February 26, 2006, plaintiff was involved in a rollover motor vehicle accident, whereafter he was evaluated by Christiana Care Health Services. (*Id.* at 296) Blood chemistry taken at the hospital revealed a positive result for opiates and cocaine. (*Id.* at 300) Plaintiff admitted to the use of alcohol prior to admittance to the emergency department. (*Id.* at 312) A CT study of plaintiff's chest and abdomen revealed "evidence of incidental T4 to T8 spinous process fractures and

---

[11]Plaintiff utilized a cane, which Dr. Borek noted was not mentioned by any doctors, and thus did not appear to be a medical necessity. (D.I. 12 at 288)

[12]On March 23, 2007 and April 13, 2007, state agency physicians Karen Sarpolis, M.D. and Henry Scovern, M.D. reviewed and agreed with Dr. Borek's assessment. (D.I. 12 at 387-90)

15

left-sided L2 transverse process fracture." (*Id.* at 297) On physical examination, plaintiff had a motor strength assessment of 5/5 except for 3+ for the iliopsoas muscles, which Dr. Kennedy Yalmanchili attributed to "pain rather than true deficit." (*Id.*) Dr. Yalmanchili requested additional spinal studies to assess plaintiff's injuries. (*Id.*)

Discharge papers dated February 27, 2006 state that plaintiff's discharge diagnoses were as follows: (1) acute alcohol intoxication; (2) cocaine positive on toxicology screen; (3) right 4th through 8th rib fractures and right 8th through 10th posterior rib fractures; (4) left L2 transverse process fracture; and (5) T4 through T8 spinous process fractures. (*Id.* at 312) The discharge note states that, after consultation with Dr. Yalmanchili, plaintiff was noncompliant with his spinal precautions, taking off his collar and sitting upright, and "at times was very verbally abusive to staff members and was refusing certain treatments and medications." (*Id.* at 313) After consultation with Dr. Fried, plaintiff was placed on his prior pain medications with additional Percocet for breakthrough pain. (*Id.*) Plaintiff did not comply with doctors' wishes to be fitted for a TLSO brace and was discharged against medical advice. (*Id.*)

On June 27, 2006, plaintiff provided a "disability report" to the agency wherein he reported that he has problems dealing with the pain from his accidents. (*Id.* at 166) With respect to his current medications (Diazepam, Napxon, "Ocyccda," OxyContin and Remeron), plaintiff reported no side effects aside from sleepiness (from Remeron). (*Id.* at 168) Plaintiff also reported that it was hard for him to complete everyday tasks due to pain and the mental stress associated with it. (*Id.* at 169) He stated that he has trouble sleeping due to "nightmares and depression" and that he cannot sit or stand for

16

a length of time. (*Id.* at 170)

The record contains several records from Dr. Fried post-dating the February 2006 accident. On August 28, 2006, Dr. Fried noted that plaintiff was still experiencing back pain, but he "has been really busy with moving into his house and this has made it harder to handle things," but "[h]e is getting by better." (*Id.* at 422) Dr. Fried renewed plaintiff's prescriptions and requested an additional urine drug screening. (*Id.*) On September 25, 2006, Dr. Fried noted that plaintiff was still having back pain, that the medications were helping, and that plaintiff had completed his move and "has been very happy." Plaintiff's drug screen results were normal. (*Id.* at 423) On October 24, 2006, Dr. Fried again noted that plaintiff's medicines seem to be helping with his back pain and that "[h]e is going to start [a] job doing painting and then as a foreman." (*Id.* at 424) In December, Dr. Fried noted that plaintiff "tried to go back to work, which is a pretty light duty work. He could not do very well with it." (*Id.* at 426) In February 2007, Dr. Fried noted that plaintiff was experiencing back pain and left leg pain, and occasionally, back cramps lasting about a day, resulting from physical activity. (*Id.* at 428) They discussed returning to light duty work. (*Id.*)

The additional 2007 in 2008 records indicate that, while plaintiff still reported pain, he was doing well with medications. (*Id.* at 429-43) A disability report completed by plaintiff on July 25, 2007 indicates that plaintiff had "constipation and itchiness" from some of his medications (OxyContin, Percocet and Valium) and no side effects from Prozac. (*Id.* at 178) Plaintiff also reported at that time severe pain with "cooking and driving." (*Id.* at 179)

## D. Hearing Before the ALJ

### 1. Plaintiff's testimony

Plaintiff testified at the hearing that he was in a wheelchair following the 2003 surgery for about two to three months, and then used a walker after that. (*Id.* at 36) Plaintiff had been treating with Dr. Fried since before the 2003 accident. (*Id.* at 38) In 2001, plaintiff broke his collarbone and has a plate with screws in his collarbone. (*Id.* at 39) He testified that his shoulder bothered him "off and on" in 2005, and that surgery alleviated some of his hip pain. (*Id.*) Plaintiff's knees were also bothering him in 2005, from hitting them on the dashboard in the 2003 accident. (*Id.*) Plaintiff stated that it is very hard for him to bend down on his knees at all and, if he does, he has difficulty getting up. (*Id.* at 40) Plaintiff's typical daily activities in 2005 were as follows. He would wake up and take his medication, after which he might doze off for a little while. (*Id.* at 40-41) He would lay down on the couch for the rest of the morning until lunchtime, when he would take additional medication, and sleep again. (*Id.*) He stated that he could not sit at a job during the working day because he could not sit long enough and would also fall asleep with the medication. (*Id.* at 41) Plaintiff testified that he "very seldom[ly]" socializes or goes out of the house, and is depressed because he cannot work. (*Id.* at 42) Plaintiff's fiancee does "a good 99%" of the cleaning and cooking, and his son does the yardwork. (*Id.* at 43) Plaintiff testified that he can walk about a block, and can sit 15 or 20 minutes at a time. (*Id.* at 47) He denied having alcohol or drug problems and stated that he did not know where the drugs came from in his bloodwork. (*Id.* at 48-49) Finally, plaintiff testified that he could not work at a desk

18

job because looking down at paperwork for any length of time would bother his neck, and that he cannot drive very far without taking a break. (*Id.* at 50)

### 2. Fiancee's testimony

Plaintiff's fiancee, Patricia Dade, also testified at the hearing. She stated that plaintiff was "unstable" after the 2003 accident, in that he would toss and turn at night, have flashbacks, never get a full night's sleep, and get only 1-2 hours of relief from pain with medications at a time. (*Id.* at 51) She works as a house cleaner and calls plaintiff every day in between her cleaning jobs, finding that he is usually sleeping. (*Id.* at 52) Ms. Dade confirmed that she does all of the cooking and housework and stated that plaintiff is uncomfortable in the evenings. (*Id.* at 53) "For the majority of the time [plaintiff] stays in a groggy position to where he's not alert 100 percent." (*Id.*) Plaintiff would forget how to make out a bill after 24 hours of her instructing him how to do it. (*Id.*) Ms. Dade also stated that plaintiff: is always sitting or lying down; gets migrane headaches 4 times per week; suffers from severe depression; has no self esteem or social life; and has a life consisting of "watching TV and sleeping." (*Id.* at 54-55)

### 3. Son's testimony

Plaintiff's son, Michael, was 19 at the time of the hearing and living at home. He testified that his father was in a wheelchair for two to three months after the 2003 accident, and that he helped him in and out of bed and the wheelchair and with cooking, shopping, and other tasks. (*Id.* at 56) His role did not change after the 2004 accident. (*Id.* at 57) Plaintiff's son also testified that he takes care of the outside of the house (yard and pool). His father sleeps and lays down most of the day; there has

19

been no significant difference between 2005 and the present time. (*Id.* at 57-58) He

does not believe that his father can work because plaintiff cannot stand or sit for long

periods of time and has bathroom and sleeping problems. (*Id.* at 58-59)

### 4. Vocational expert testimony

The hypothetical question that was asked by the ALJ is as follows:

> I'd like for you to assume if you would a person who is 44 years of age on his
> onset date which he puts at 8/05/03. His date last insured appears to be
> 12/31/05. He has a twelfth grade education and the past relevant work as just
> indicated [body and fender man per the DOT]. . . Suffering from the status post
> effects of a motor vehicle accident in [08/03], and he injured his back and [ ] left
> hip fracture, some knee problems caused him to have moderate pain and
> discomfort, severe on occasion. He had some sciatic problems which was pretty
> much rectified in August of '04 by way of operation. All of his conditions are
> somewhat relieved by his medication without significant side effects, but he
> indicates that he derives some sleepiness from one or a combination. He also
> indicated by testimony through witnesses that he has some mild depression,
> takes Zoloft. He sees no treatment doctors for that, however. And if I find that
> he needs to have simple routine unskilled jobs due to his pain, SVP jobs, low
> stress, low concentration, low memory, is able to attend tasks and complete
> schedules, however. If I find that he can lift 10 pounds occasionally, lesser
> amounts frequently, can sit for 15 or 20 minutes, stand 15 or 20 minutes
> consistently on an alternate basis during an 8 hour day, 5 days a week, but
> would have to avoid heights and hazardous machinery due to those medications,
> avoid temperature and humidity extremes, no prolonged climbing, balancing, or
> stooping and by that I mean no more than once or twice an hour, avoid
> vibrations, ladders, ropes, stairs, scaffolds, and would be mildly limited as to
> push and pull in that right upper extremity due to a previous injury, but would
> seem to be able to do sedentary work activities with his limitations. Are there
> jobs that would exist out there in the national economy in significant numbers
> such a person could do in your opinion as a vocational expert?

(*Id.* at 61-62) Based on this hypothetical, the VE testified that plaintiff could perform

two light, unskilled jobs: an assembler; and a sedentary (unarmed) security guard. (*Id.*

at 62) Both jobs would allow plaintiff to sit and stand as the ALJ indicated and exist in

significant numbers in the local and national economies. (*Id.* at 62-63) The VE agreed

that plaintiff would not be able to do any of his past, relevant work. (*Id.* at 63) On cross-examination, the VE admitted that it is difficult to place people that are on narcotics, and that if the ALJ found all of plaintiff's and his witnesses' testimony as to his limitations entirely credible, there would be no jobs plaintiff could perform. (*Id.* at 64-65)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether

there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation

process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the RFC to perform his past work. If the claimant cannot perform his past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such

as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) &

404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the

case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. The ALJ's Decision

The ALJ considered the medical evidence of record and testimony received at

the hearing, and concluded that plaintiff retains the capacity for work and is not disabled

as defined by the Social Security Act. The ALJ made the following enumerated

findings.

1. The claimant meets the insured status requirements of the Social Security Act
through December 31, 2005.

2. The claimant has not engaged in substantial gainful activity since August 5,
2003, the alleged onset date (20 C.F.R. 404.1520(b) and 404.1571 et seq.).

3. The claimant has the following severe impairments: degenerative disc
disease, osteoarthritis, depression, status post left acetabulum fracture, sciatic
neuropathy and lumbar radiculopathy (20 C.F.R. 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments
that meets or medically equals one of the listed impairments in 20 C.F.R. Part
404, Subpart P, Appendix 1 (20 C.F.R. 202.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the
claimant has the residual functional capacity to perform simple, unskilled, low
concentration, low stress, low memory, sedentary work as defined in 20 C.F.R.
404.1567(a) except that he could lift 10 pounds occasionally, less than 10
pounds frequently, sit for 15 to 20 minutes, stand for 15 to 20 minutes,
consistently on an alternate basis during an 8 hour day, 5 days a week, with no
prolonged climbing, balancing or stooping, mildly limited to push and pull in the
upper right extremity, avoiding exposure to heights and hazardous machinery,
temperature extremes, humidity, vibrations and no climbing of ladders, ropes,
scaffolds and stairs.

6. The claimant is unable to perform any past relevant work (20 C.F.R.
404.1565).

7. The claimant was born on August 10, 1958 and was 44 years old, which is

defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1560(c) and 404.1566).

(D.I. 12 at 16-28)

## C. Analysis

### 1. Manipulative limitations

With respect to the medical evidence, plaintiff's primary argument on appeal is that the ALJ did not properly consider his limitations to his hand and wrist (manipulative limitations). (D.I. 14 at 14-15) Plaintiff calls out a notation in Dr. Borek's notes, wherein he references ". . . djd w/ non union navicular lt wrist. . ."; while Dr. Borek said that the maximum RFC was for sedentary work, there is no explanation of what this notation means, or how it played (if at all) into Dr. Borek's conclusion. (D.I. 12 at 288) As noted above, hospital records indicate that plaintiff sustained a wrist injury in February 2004. (*Id.* at 192-94) Plaintiff submitted an affidavit (dated October 6, 2008) to the Appeals Council that plaintiff was not lifting the washing machine, but was holding a door when the washing machine his son was helping a friend lift fell and crushed his wrist.[13] (*Id.* at

---

[13]The ALJ did not have this affidavit, and the wrist injury did not come up at the hearing. That the ALJ ultimately noted in his opinion that plaintiff was "helping a friend lift a washing machine" is not of moment, given the lack of evidence regarding plaintiff's

25

191)

Plaintiff acknowledges that the ALJ noted that Dr. Borek checked boxes indicating that plaintiff was limited in his ability to handle and finger. (*Id.* at 27) He argues, however, that the ALJ erred in affording these limitations "little weight as they are not consistent with the medical record as a whole." (*Id.*)

According to the guidelines, "[a]ny **significant** manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." S.S.R. 96-9p (July 2, 1996) (emphasis added). Plaintiff points to no record evidence that his manipulative limitations were "significant," and Dr. Borek only characterized plaintiff's "handling (gross manipulation)" and "fingering (fine manipulation)" as "limited" (in contrast with "unlimited"), without further explanation. (D.I. 12 at 284) As defendant points out, plaintiff did not testify as to wrist pain or dextral or manipulative limitations at the hearing. Plaintiff did not complain to his treating physicians about problems with manipulation (or wrist pain). Plaintiff does not call out any evidence omitted by the ALJ relating his wrist injury to a decrease in functioning, or any impact on daily life activities. (D.I. 14 at 14-15)

## 2. Hypothetical question to the VE

Plaintiff next argues that the hypothetical to the ALJ was critically deficient, in that it failed to acknowledge plaintiff's restrictions to handle and work with small objects with both hands, and also failed to acknowledge that medications that plaintiff was

_____

manipulative limitations, as discussed *infra*.

using would prevent him from working. (D.I. 14 at 15-16) In view of the scarcity of medical evidence regarding plaintiff's dextral limitations,[14] the ALJ did not err in omitting such limitations from the hypothetical question. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) ("We do not require an ALJ to submit to the vocational expert every impairment **alleged** by a claimant"; "the ALJ must accurately convey to the vocational expert all of a claimant's **credibly established limitations**") (emphasis in original) (citation omitted).

The record is replete with references to plaintiff's medications for pain, and plaintiff is correct that the ALJ did not suggest that the medications were inappropriate. While plaintiff reiterates that he had pre-existing back problems and a very serious injury in 2003, necessitating surgery in 2004, plaintiff does not cite to evidence of record that his medications diminished his capacity to do work (or other tasks). (D.I. 14 at 15-16) On the contrary, plaintiff consistently reported that he had little (if any) side effects from his medications. (D.I. 12 at 149, 168, 178);[15] *See Burns v. Barnhart*, 312 F.3d 113, 130-31 (3d Cir. 2002) (finding the ALJ's decision to discount plaintiff's allegations of side effects was supported by substantial evidence, where the state agency

---

[14]The court rejects plaintiff's suggestion in his answering/reply paper that an "obvious" reason there is little in the record concerning the wrist injury is that he was treating primarily for other injuries, and "[i]f there was nothing that could be done for the wrist, then it is not surprising that there is nothing found in the record concerning the wrist." (D.I. 17 at 8) Such a conclusion is both speculative, and inconsistent with the fact that plaintiff treated for his other injuries far beyond his surgery date (if only to continue on his maintenance medication).

[15]In addition to this subjective evidence, Dr. Fried also reported on several occasions that plaintiff was doing well on his medications. (D.I. 12 at 240, 264, 270, 271, 274)

physician noted plaintiff did not seem drowsy during his examination, plaintiff did not

seem drowsy at the hearing, and there was "no medical evidence as to any physical

limitations resulting from any side effects from medication").

### 3. Witness credibility

Finally, plaintiff argues that the ALJ erred in finding plaintiff's testimony, as well

as the testimony of his witnesses, only partially credible. (D.I. 14 at 17-19) Specifically,

the ALJ stated that plaintiff's

> statements concerning the intensity, persistence and limiting effects of these
> symptoms are not credible to the extent they are inconsistent with the residual
> functional capacity assessment for the reasons explained below. The
> undersigned credits Ms. Vied's and Mr. Clark's testimony to the extent that their
> testimony is consistent with the claimant's residual functional capacity as
> assigned. However, in general, the undersigned concludes that their testimony
> is not consistent with the claimant's Adult Function Report dated December 13,
> 2005 or the medical record as a whole. Ms. Vied and Mr. Clark may have been
> recalling periods following the claimant's February 2006 accident when he
> required pain medication for his fresh injuries. However, their testimony reflects
> a more impaired individual that the claimant represented.

(D.I. 12 at 26) Plaintiff points out that his son affirmed on the stand that his testimony

was relevant to the August 2003 – December 2005 time period, and that there is no

suggestion that either witness was talking about plaintiff's condition in 2006. (Id. at 56)

As defendant points out, both witnesses generally testified in the present tense.

Even if the ALJ were incorrect in interpreting plaintiff's witnesses' testimony as vague

as to the time periods, "[i]nconsistencies in a claimant's testimony or daily activities

permit an ALJ to conclude that some or all of the claimant's testimony about [his]

limitations or symptoms is less than fully credible," and "allegations of pain and other

subjective symptoms must be supported by objective medical evidence." Salles v.

Comm'r of Social Sec., 229 Fed. Appx. 140, 146 (3d Cir. 2007) (citing Burns v. Barnhart, 312 F.3d 113, 129-30 (3d Cir. 2002) and 20 C.F.R. § 404.1529).

Upon review, there are several notable inconsistencies between the witness testimony and plaintiff's December, 2005 self-assessments, as well as the medical evidence. Plaintiff testified that the bulk of his days (in 2005) were spent sleeping. (D.I. 12 at 40-41) Ms. Dade testified similarly, adding that plaintiff is mostly groggy and not fully alert. (Id. at 52-53) Plaintiff's son stated that plaintiff lays down most of the day. (Id. at 57-58) Plaintiff's commensurate report, however, indicates that he prepared his own meals and groomed himself, and that he walked his dog, shopped, played billiards and danced when his pain was tolerable. (Id. at 142-45)

The medical records also indicate that plaintiff was accomplishing more than was testified to at the hearing. Dr. Damouni reported in 2004 (prior to surgery) that plaintiff "walks 2 to 3 miles without any problems," could climb 20-30 stairs without issue, and that he reported good exercise tolerance. (Id. at 207) Dr. Fried noted that plaintiff had aggravated his symptoms by participating in "increased activities" (including climbing a ladder) in August 2004. (Id. at 253) Dr. Fried noted in September 2004 that plaintiff was helping his mother, playing a little bit of pool, and getting out with friends on occasion. (Id. at 256) In June 2005, Dr. Fried reported that plaintiff was doing "some exercising" at home. (Id. at 269) Dr. Sopa reported in December 2005 that plaintiff's back was not giving him trouble and that he was "doing well" at that time. (Id. at 279) Plaintiff vacationed in 2006 in the Carribean. (Id. at 371)

Ms. Dade testified that plaintiff had no social life. (Id. at 54-55) Plaintiff himself

indicated in 2005 that he continued to socialize with friends, though the time spent socializing was diminished due to pain. (*Id.* at 145) Plaintiff specifically reported having no difficulty in paying bills, handling accounts and the like, which contrasts with Ms. Dade's testimony that plaintiff could not recall how to make out a bill after she explained it to him. (*Id.* at 53, 144) In sum, there was sufficient inconsistency in the record (and conflicting subjective as well as medical evidence) from which the ALJ could conclude that plaintiff and his witnesses were not entirely credible with respect to plaintiff's functional capacity during the disability period.

## V. CONCLUSION

For the aforementioned reasons, the court finds that the ALJ's opinion was supported by substantial evidence of record. Plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. Judgment shall be entered in favor of defendant. An appropriate order shall issue.